IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Erica Bojicic *et al.*,                                      Case No. 3:21-CV-00630-JGC

        Plaintiffs,

    v.                                                      ORDER

Michael DeWine *et al.*,

        Defendants.

This is a § 1983 case where I dismissed Plaintiffs' complaint as frivolous and entirely

without merit. (Doc. 49); *Bojicic v. DeWine*, 569 F. Supp. 3d 669, 676 (N.D. Ohio

2021), *aff'd,* 2022 WL 3585636 (6th Cir. Aug. 22, 2022), *cert. denied,* 143 S. Ct. 735 (2023).

Pending are Defendants Eric Zgodzinski, David Covell, Joseph Mazzola, Kirkland

Norris, Peter Schade, Kate Siefert, and Donna Skoda's[1] ("Defendants") Motions for Sanctions

under 28 U.S.C. § 1927 and the inherent authority of the courts. (Docs. 53, 54). Also pending is

my own *sua sponte* order directing Respondent Plaintiffs' counsel, Robert Gargasz and Thomas

Renz ("Respondents"), to show cause why I should not impose sanctions under Federal Rule of

Civil Procedure 11, § 1927, and my inherent power. (Doc. 61). Plaintiffs themselves are not

parties to this sanctions proceeding; it concerns only the Respondent attorneys.

## Procedural Background

Following dismissal, Plaintiffs filed their notice of appeal on November 22, 2021. (Doc.

51). A week later, Defendants moved for sanctions. (Docs. 53, 54). On March 7, 2022, I issued

---

[1] Moving Defendants are the directors and commissioners of various county and municipal
health departments.

my own *sua sponte* order directing Respondents to show cause why I should not impose sanctions under Rule 11, § 1927, and my inherent power. (Doc. 61).[2]

I held a status conference on the various sanctions vehicles and scheduled an evidentiary hearing for July 11, 2022, to give Respondents a full opportunity to be heard and present any information they saw fit. (*See* Minute Order, Mar. 21, 2022).

After that hearing, Respondents filed an "Objection to [the] March 21 Court Order Imposing Burden of Proof on [Respondents] at Sanctions Hearing." (Doc. 66). I overruled the objection (Doc. 77). I explained the purpose of my March 7, 2021 show cause order—that I had already found a *prima facie* cause for sanctioning Respondents. The evidentiary hearing, as I discussed, was thus Respondents' "opportunity to 'persuade' [me] that sanctions are not warranted." (*Id.*, pgID 915 (quoting *Cook v. Am. S.S. Co.*, 134 F.3d 771, 776 (6th Cir. 1998))).

On July 8, 2022, Respondents moved for, and I granted, a continuance of the evidentiary hearing to allow them time to recruit outside counsel to defend the sanctions proceeding. (Doc. 82; Minute Order, July 8, 2022).

On August 22, 2022, the Sixth Circuit affirmed my dismissal order. *Bojicic v. DeWine*, 2022 WL 3585636 (6th Cir. Aug. 22, 2022). Around this time, Respondents secured new counsel, and I reset the evidentiary hearing on sanctions to February 13, 2023. (*See* Minute Order, Oct. 12, 2022).

---

[2] I previously granted Respondents' motion for dismissal of the portion of Defendants' motions requesting sanctions under Fed. R. Civ. P. 11. (Doc. 110). While Rule 11(c)(2) sanctions are unavailable to defendants in light of that order, I consider Rule 11(c)(3) sanctions (other than attorneys' fees under Rule 11(c)(4)) and the Rule 11 standard of conduct under my show cause order. (Doc. 61); *see also Dunn v. Post*, 2022 WL 1297586, at *1 (6th Cir. Jan. 27, 2022); *iParametrics, LLC v. Howe*, 522 F. App'x 737, 740 (11th Cir. 2013) ("The district court complied with all the procedural requirements of Rule 11 before sanctioning [respondent]. The district court notified [respondent] that he had violated Rule 11, and the district court held a hearing at which [respondent] could respond before imposing a sanction.").

Plaintiffs petitioned the Supreme Court for a writ of certiorari on November 21, 2022. (*See* Doc. 96). Six weeks later, on January 4, 2023, Plaintiffs moved for, and I granted, a stay of the sanctions proceeding pending resolution of their petition. (Doc. 100; Minute Order, Jan. 9, 2023). The Supreme Court denied the certiorari petition on January 18, 2023. *Bojicic v. DeWine*, 143 S. Ct. 735 (2023). Upon that denial, I reset the evidentiary hearing yet again for May 1, 2023. (*See* Minute Order, Mar. 28, 2023).

Respondents presented two days of testimony and documents at the May hearing, discussed below. And Defendants and Respondents submitted post-hearing briefs in support of and in opposition to sanctions, respectively.

## Discussion

I consider sanctions under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and my inherent power. These sanctions vehicles are closely related but different in their details.

### 1. Burden of Proof

Common to all three sanctions mechanisms is their treatment of the burden of proof. A party seeking sanctions bears the ultimate burden of proof to show that sanctions are appropriate. *TEGG Corp. v. Beckstrom Elec. Co.*, 2008 WL 5216169, at *3 (W.D. Pa. Dec. 10, 2008) ("The burden of proof and persuasion rests on the party moving for sanctions [under Rule 11]"); *Scott v. Bank of Am., N.A.*, 2022 WL 4587839, at *12 (E.D. Mich. Sept. 29, 2022) ("The burden of proof is on the party seeking attorney fees under § 1927.") (citing *Cook v. Am. S.S. Co.*, 134 F.3d 771, 776 (6th Cir. 1998)); *Young v. Aramark Corr. Serv. Llc*, 2022 WL 20487073, at *2 (N.D. Ohio Nov. 2, 2022) (Armstrong, Mag. J.) ("[T]he party seeking [inherent power] sanctions bears the burden of proof in establishing these facts.").

I have already decided that Defendant's Motions for Sanctions and the facts of this case show a *prima facie* case for application of Rule 11, § 1927 and inherent power sanctions. (Docs. 61, 77). Thus, while the ultimate burden of *persuasion* stays on Defendants, Defendants have satisfied their initial burden of *production* through a *prima facie* showing.

Once a movant establishes a *prima facie* case, the burden of production shifts to the sanctions respondent to come forward with a reason why they should not be sanctioned. *See Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007) ("Once a litigant moves based upon non-frivolous allegations for a Rule 11 sanction, the burden of proof *shifts* to the non-movant to show it made a reasonable pre-suit inquiry into its claim."); *see also Elec. Workers Pension Tr. Fund of Loc. Union 58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003) (discussing a contemnor's burden of production after the party moving for contempt has established a *prima facie* case).

In this sanctions proceeding, the burden of production is now on Respondents, who have had the "opportunity to respond[] by presenting evidence and arguments why sanctions should not be imposed." *Cook, supra*, 134 F.3d at 776 ("[T]he party has the opportunity to 'persuade' the court that sanctions are not warranted. This is a well established procedure in dealing with § 1927 sanctions and we see no reason to repudiate the procedure now. Therefore, the burden of proof has not been shifted; the show cause order merely facilitated the due process requirements[.]"); *Olga's Kitchen of Hayward, Inc. v. Papo*, 108 F.R.D. 695, 701–02 (E.D. Mich. 1985) ("The party whose conduct is under [Rule 11] scrutiny has the burden of

demonstrating that he discharged his duty of reasonable inquiry."), *rev'd in part on other grounds sub nom. Olga's Kitchen v. Papo*, 815 F.2d 79 (6th Cir. 1987).[3]

### 2.  Facts and Conduct Considered

I base my decision on Respondents' litigation conduct. This includes, for Rule 11, Respondents' pre-suit conduct, inquiry, investigation, and research in preparing and filing their Complaint. Relevant to both Rule 11 and § 1927, I consider Respondents' conduct following the initiation of this lawsuit and their efforts in opposition to Defendants' Motions to Dismiss.[4] I further consider the testimony and documents provided to me at the evidentiary hearing.

Respondents argue that I should not consider their conduct on appeal as evidence of bad faith or frivolous conduct before the district court (Doc. 129, pgID 1998), but that I *should* consider their conduct on appeal as evidence of nonfrivolous conduct (*Id.*, pgID 1996).

I do not consider here Respondents' conduct during the unsuccessful appeal or the petition for certiorari, neither of which affected in any substantive way my original dismissal. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 407 (1990) ("The Federal Rules of Appellate Procedure place a natural limit on Rule 11's scope. On appeal, the litigants' conduct is governed by Federal Rule of Appellate Procedure 38, which provides: 'If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee.' If the appeal of a Rule 11 sanction is itself frivolous, Rule 38 gives appellate courts

---

[3] At worst, the foregoing discussion shows that courts, including this one, have been somewhat muddled in their allocation of the "burden of proof." For purposes of this Order, the only burden I place on Respondents is the relatively modest one of rebutting the *prima facie* case as I originally outlined it in my prior Orders. (Docs. 49, 61, 77; *Bojicic, supra*, 569 F. Supp. 3d 669). As I discuss in what follows, Respondents have entirely failed to meet that modest burden. They have not come forward with a factually or legally plausible justification for the multifarious failings that they consistently made throughout this litigation.

[4] One Defendant moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Doc. 21). For simplicity, I refer here to all the dispositive motions collectively as the "Motions to Dismiss."

ample authority to award expenses."); *Webster v. Sowders*, 846 F.2d 1032, 1040 (6th Cir. 1988) ("We recognize that in the course of a lawsuit, the proceedings often take place in both the trial and appellate courts, and that some motions or other actions, such as the motion to stay the pay orders pending appeal, may have impacts at both levels. Nevertheless, the sanction statutes, the rules, and the case law provide for fairly clear separation between conduct on appeal sanctionable by the appellate court and conduct in the trial court sanctionable by the trial court.").

Thus, I do not consider any conduct on appeal as evidence of sanctionable conduct at the district court level. But I also do not consider conduct on appeal as excusing or redressing *nunc pro tunc* what happened before me.

Whether or not the appellate court sanctioned appellate conduct has no relevance here. It is entirely consonant that Respondents' conduct on appeal may have comported with the law while their conduct before me did not.[5] *See, e.g., DiPonio Const. Co. v. Int'l Union of Bricklayers & Allied Craftworkers, Loc. 9*, 687 F.3d 744, 754 (6th Cir. 2012) ("For the reasons

---

[5] Respondents argue that, because the circuit court granted oral argument under Federal Rule of Appellate Procedure 34, then the appeal—and by extension, the Complaint and Opposition Brief—necessarily "presented genuine, not frivolous, issues." (Doc. 129, pgID 1996; *see also* Doc. 124, at 234:1–9). Respondents incorrectly invert the rule. Appellate Rule 34(a)(2) states that oral argument *must* be allowed unless the three-judge panel *unanimously* agrees that argument is unnecessary because, among other reasons, the appeal is frivolous. Scheduling oral argument thus only shows the panel did not unanimously agree to forego it, for reasons we cannot glean from the record.

Regardless, though I do not consider it here, Respondents continued to make bald and bare assertions before the circuit court. *E.g.*, *Bojicic, supra*, 2022 WL 3585636, at *9 ("The Plaintiffs criticize [the Government Orders] as demonstrating 'unconscious or implicit bias towards the official government narrative on the dangers posed by Covid-19 and the unscientific methods for its containment.' This extraordinary assertion is presented without any factual support. And beyond the fact that it presupposes conspiratorial bad faith on the part of a variety of state officials, it ignores the fact that these orders were issued at the very beginning of the pandemic, when no government official could possibly have had the kind of information about the efficacy of its particular actions that the Plaintiffs demand.").

stated above, we AFFIRM the district court's decision to dismiss DiPonio's claims for lack of subject-matter jurisdiction and to award sanctions under Rule 11, but DENY the Union's motion for further sanctions because the appeal is not wholly without merit.").

Respondents take issue with Defendants' decision not to present evidence at the sanctions hearing. Respondents assert that "there are insufficient facts in evidence to support a finding of misconduct." (Doc. 129, pgID 1993). According to Respondents, my allowance of a full, in-court hearing to present testimony and documents acted as a complete and self-contained trial—requiring Defendants, as movants and the party with the burden of persuasion, to present its affirmative case much like the plaintiff or prosecution in a jury trial. This is incorrect.

In fact, due process requires no such "evidentiary" proceeding at all. *DiPonio, supra*, 687 F.3d at 752 ("In this circuit, there is no requirement that a full evidentiary hearing be held before imposing sanctions. All that is required is that the party be given notice and an opportunity to be heard.") (internal citation and quotation marks omitted). It is within my discretion to determine whether an evidentiary hearing would further assist my determination of whether Respondents' conduct is sanctionable. *Cook, supra*, 134 F.3d at 775.

The evidentiary hearing allowed Respondents the fullest and most complete opportunity I could give to be heard—through witness testimony, through document exhibits, and through argument. It imposed no duty on Defendants to present more evidence. The evidence of potentially sanctionable conduct has been and continues to be before me—namely, the insufficiencies manifest during Respondents' continued prosecution of this case.

### 3. Federal Rule of Civil Procedure 11 Sanctions

Under Federal Rule of Civil Procedure 11, "sanctions may be imposed if a reasonable inquiry discloses [that a] pleading, motion or paper is (1) not well grounded in fact, (2) not

warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, or (3) interposed for any improper purpose such as harassment or delay." *Gibson v. Solideal USA, Inc.*, 489 F. App'x 24, 29 (6th Cir. 2012). "[T]he reasonable inquiry under Rule 11 is not a one-time obligation. [Plaintiffs are] impressed with a continuing responsibility to review and reevaluate [their] pleadings and where appropriate modify them to conform to Rule 11." *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 374 (6th Cir. 1996).

Sanctions are not appropriate where the pleading or paper raises issues that "were fairly debatable and not easily resolved," or "[t]here was no clear binding precedent on the issues." *Laborers Loc. 938 Joint Health Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454, 1458 (11th Cir. 1987); *accord Hy-Ko Prod. Co., v. Hillman Grp., Inc.*, 2012 WL 892560, at * 6 (N.D. Ohio Mar. 14, 2012) (Dowd, J.). The standard, though, is an objective one, "intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. Counsel's subjective belief is irrelevant. The question is "whether a competent attorney . . . , after appropriate investigation, would have reasonably believed that the claim was well grounded in fact and law." *Elsman v. Standard Fed. Bank (Mich.)*, 238 F. Supp. 2d 903, 909 (E.D. Mich. 2003).

The inquiry focuses on counsel's conduct at the time it occurred, asking "what was reasonable to believe at the time . . . ." *Salkil v. Mount Sterling Twp. Police Dep't*, 458 F.3d 520, 530 (6th Cir. 2006). I cannot judge Respondents' conduct through today's lens and with the benefit of hindsight; I must assess the conduct "from the standpoint of a reasonable attorney at the time counsel committed the sanctionable conduct." *Id.* at 531.

The Advisory Committee on Civil Rules notes that courts can consider multiple factors in evaluating whether sanctions are appropriate, including, among other factors: "[1] Whether the

improper conduct was willful, or negligent; [2] whether it was part of a pattern of activity, or an isolated event; [3] whether it infected the entire pleading, or only one particular count or defense; [4] whether the person has engaged in similar conduct in other litigation; [5] whether it was intended to injure; [6] what effect it had on the litigation process in time or expense; [and] [7] whether the responsible person is trained in the law . . . ." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

The Complaint that Respondents signed and submitted was haphazard—at points, incomprehensibly so—and was littered with factual and legal errors.

Instead, the Complaint and the Opposition Brief are long-winded in their explanation that emergencies do not give government actors license to violate the Constitution (Doc. 36, pgID 367 (citing *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 68 (1866))). Nobody disputes this. Respondents, however, never provided a nonfrivolous explanation for the antecedent question: How, in light of the absolute and qualified immunities indisputably possessed by Defendants, did they violate a clearly established constitutional right? *See Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)).

A plaintiff's first shot in explaining their controversy is the complaint. If that shot misses the Rules 8 and 9 pleading requirements, the contest is over. Respondents' one shot, like their others in this and other related litigations discussed *infra*, totally missed that mark. To the extent they take exception to that fact, they are attempting to argue that their arrow actually pierced the target. Not only is this incorrect, as the Sixth Circuit and I have already rejected their supposed merits, but Respondents were so far off—unmoored by the facts and the law—that I am quite unsure where their arrow even landed. They cannot pretend that their post-hearing brief (Doc. 129, pgID 2004) reopens the range for a new round of shots at my original, affirmed decision.

9

### a.  Respondents' History and Notice of Defective Pleadings

Respondents failed to comply with established federal pleadings standards throughout this case—resting instead on bare conclusions that lacked any merit. This error was manifest throughout the Complaint. It persisted in the Opposition Brief, where Respondents doubled down on their legal conclusions and conjecture.

This is not the first time they have done so. Respondents brought two other suits in this Court, all based on the same or similar objections to government COVID orders.

In the first, which was before me, Respondents filed a lawsuit against the State of Ohio, its governor, its state director of public health, and a county health department. *Renz v. Ohio*, 2021 WL 485534, at *1 (N.D. Ohio Feb. 9, 2021). I granted defendants' motions to dismiss. The complaint was incomprehensible and was "neither short nor plain." *Id.* (citing Fed. R. Civ. P. 8(a)(2)). I gave Respondents an opportunity to correct it. They did not. In fact, the amended complaint they filed became more prolix and less coherent. As I told Respondents in my order in the *Renz* case:

> Aside from its continuing admixture of argument and citations, it indiscriminately blends factual allegations, conclusions, and speculation. Its related affidavits, declarations, and exhibits are similarly a jumble of alleged facts, conclusory and speculative assertions, personal and third-party allegations, opinions, and articles of dubious provenance and admissibility, such as local television news reports, and web-based materials.

*Id.*

Undeterred, in *Ohio Stands Up! v. U.S. Department of Health & Human Services*, Respondents tried again, using a different theory and a new plaintiff. 564 F. Supp. 3d 605 (N.D. Ohio 2021) (Knepp, J.), *aff'd,* 2022 WL 1576929 (6th Cir. May 19, 2022). Respondents sued federal entities, including the U.S. Department of Health & Human Services, the Centers for Disease Control and Prevention, the National Center for Health Statistics, and the Office of

Management and Budget. *Id.* at 610. They claimed that the defendants violated the Paperwork

Reduction Act, Information Quality Act, Administrative Procedures Act, and the "[i]mplied

[c]onstitutional [d]uty of [h]onesty and [f]air [d]ealing." *Id.* Respondents' allegations contained

similar grievances concerning their dispute with the facts, data, and conclusions about the

COVID virus and pandemic response relied on by government agencies.

My colleague, the Honorable James R. Knepp, granted dismissal, and the Sixth Circuit

affirmed, holding that the plaintiffs lacked standing. *Ohio Stands Up!*, 2022 WL 1576929, at *2.

Judge Knepp also admonished Respondents during a hearing for the conclusory nature of their

pleading. He reminded Respondents that I had already warned them about factually and legally

dubious claims. (Doc. 115, Resp't Ex. 56, at 10:3–16).[6]

Respondents heeded neither warning. As I explain below, the Complaint and Opposition

Brief here, like those before it, lacked merit. They did not comply with the pleadings

requirements explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v.*

*Iqbal*, 556 U.S. 662 (2009). They rested instead on vague and conclusory statements.

Respondents did not learn from past errors, despite patience from the courts. Here, they

repeated their errors yet again. *See Fuery v. City of Chicago*, 900 F.3d 450, 468 (7th Cir. 2018)

("When an attorney repeatedly violates the standards and oaths of the profession, then a court

may take notice of that attorney's disciplinary history when evaluating whether sanctions are

appropriate."). Unlike the respondent in *Fuery*, Respondents have no disciplinary histories. But

---

[6] As the court told Respondents: "Candidly, Mr. Renz and Mr. Gargasz . . . , this complaint reads not like a complaint. It reads like the script for a . . . late night cable TV news program or worse. And . . . I know Judge Carr reminded you all, or some of you all, about Civil Rule 8, specifically Rule 8(a)(2), and I just believe, and I'm going to tell you, that this complaint in my mind runs way afoul of that. Merely taking something like this and inserting numbers in front of—in front of paragraphs does not change an article or a memorandum or whatever this is into a complaint. It doesn't. And this is not a complaint. And I don't know how—I don't know how I would respond to this if I were defending this action." *Id.*

Respondents have ignored the admonitions from me and my colleague: their complaints utterly lacked merit, and their pursuit of frivolous claims and contentions unsupported by any law wastes the courts' time, wastes Defendants' time, and impugns the public's faith in the bar and bench as a forum for the resolution of meritorious controversies. *See id.* ("[I]t is extremely desirable that the respectability of the bar should be maintained, and that its harmony with the bench should be preserved.") (quoting (*Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 530 (1824)); *see also* Wright & Miller, *Federal Practice & Procedure* § 1334 (4th ed.) ("[P]artisan advocacy is a form of public service so long as it aids the process of adjudication; it ceases to be when it hinders that process, when it misleads, distorts, and obfuscates, when it renders the task of the deciding tribunal not easier, but more difficult.") (quoting Fuller & Randall, *Professional Responsibility: Report of the Joint Conference*, 44 A.B.A.J. 1159, 1162 (1958)).

Even worse than these manifold and manifest professional failings, Respondents deliberately misled their clients into believing mistakenly that they had meritorious claims.

### b. Identifying specific actions and actors

Respondents failed to identify the specific actions of Defendants on which they purported to base § 1983 liability. Respondents failed to identify the government "orders" that they alleged violated Plaintiffs' constitutional rights. This forced both Defendants and me to go hunting for the foundation of Respondents' lawsuit. This is not Defendants' obligation, and it is not my task.

In fact, after determining the government orders that I believed were at issue, it appeared that only one of the Defendants, Amy Acton, was responsible ultimately for their promulgation. Respondents argued that Defendants, as a group, "threatened to enforce" the order. (Doc. 36, pgID 362, 367). This conclusion had no basis in fact.

If Respondents wished to sue state actors for alleged violations of the Constitution, then it was their duty to investigate whether Plaintiffs had standing against each Defendant. Their conclusory statements in the Complaint and Opposition Brief evidenced a lack of any such investigation or inquiry.

### c.   Rational Basis Review

Respondents failed to discuss in any coherent or meaningful way how Defendants' actions lacked any rational basis. This case involved neither recognized fundamental rights nor members of a protected class. Therefore, none of the heightened levels of scrutiny applied here. *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 126 (6th Cir. 2020) ("[M]any other [COVID] cases involve executive actions that, by precedent, are viewed only through the lens of a very modest, or 'rational basis,' standard of review. And almost without exception, courts in those instances have appropriately deferred to the judgments of the executive in question.").

The following are the entirety of Respondents' Complaint allegations and motion argument concerning the legal foundation of their entire lawsuit:

- "Plaintiffs will also seek declaratory relief and damages as appropriate for the unequal application of the laws, where businesses were treated differently without even a rational basis for such actions." (Doc. 1, ¶ 5).

- "The [business] reopening guidelines continued the pattern of arbitrariness failing to explain or justify in any way the rationale behind the strategy. There were no uniform standards or procedural safeguards for enforcement and only a very limited question and answer process pertaining to what services are prohibited." (*Id.* ¶ 77).

- "There is no rational basis for the orders; there is no standard to determine which activities are 'essential' and which are 'non-essential.' . . . These actions violated the Ohio Constitution Article 1, and the US Constitution Amendments 1, 5, 9, and 14, as well as the equal protection clause. The Plaintiffs have sufficiently stated their claims and the Defendant's Motions should be denied." (Doc. 36, pgID 365).

13

- "Defendants' unlawful mandates and the enforcement thereof are so unreasonable as to be unlikely to even pass muster with intermediate or rational basis scrutiny. The Defendants have no rational basis or standard behind their definitions of 'essential' and 'non-essential.' The Plaintiffs suffered unequal treatment as compared to other businesses subject to the Defendants' orders and enforcement of said orders." (*Id.*, pgID 368).

Respondents presented these statements *ex cathedra*, bereft of citation to any authority. Aside from their repetition of these adjectives, Respondents made no attempt to show how the challenged orders were "arbitrary," "unlawful," or "unconstitutional." When it came time to respond to Defendants' well-taken arguments about the extensive failings of the Complaint, Respondents simply repeated, without legal or factual support, the forgoing labels.

Respondents ignored and completely failed to discuss established Supreme Court and Sixth Circuit precedent regarding rational basis review. Namely, barring application of any heightened scrutiny, the government need not be correct on the science and in fact can base its actions on "rational speculation unsupported by evidence or empirical data." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 836 (6th Cir. 2009) (citing *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir. 2006)).

Respondents needed to bring this mandatory authority to my attention. *Kassab v. Aetna Indus., Inc.*, 54 F. App'x 819, 825 (6th Cir. 2002) (affirming Rule 11 sanctions where a party "*sub silentio* ignored thirty-five years of clear precedents of both the Supreme Court and [the Sixth Circuit]"). Making matters worse, when Defendants cited the correct law and analysis under the rational basis standard, Respondents remained on their virtual soap box and repetitiously cried: "No rational basis!" (Doc. 1, ¶ 5) "No rational basis!" (Doc. 36, pgID 365) "No rational basis!" (*Id.*, pgID 368). They made no attempt to distinguish or argue against what was and is clear, black-letter law.

14

Instead of researching the law, Respondents say they researched the "science." (*See* Doc. 125, at 465). The Complaint allegations and the Opposition Brief arguments against the Government Orders mainly concern Respondents' untutored lay opinions regarding the accuracy of the then-current scientific understanding of the COVID virus and the merit of public policies geared at preventing its spread.

For example, Respondents wrote in the Complaint: "It is well established in science and under regulatory guidelines that strenuous activities should not be performed with masks on." (Doc. 1, ¶ 56). Respondents also alleged that COVID "can now be shown to be as dangerous as the yearly flu." (*Id.* ¶ 3). None of Plaintiffs' pleadings in this case contain even a single citation to these so-called "well-established" scientific facts.

I do not pass judgment on whether Respondents' scientific proclamations are correct. As the Chief Justice observed, "[w]here those broad limits [on officials' ability to act in areas fraught with medical and scientific uncertainty] are not exceeded, they should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring) (internal quotation marks omitted) (citing *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985)). Unlike Francis Bacon's jesting Pilate, I need not ask "What is truth?" And I further need not stay for an answer.[7]

Plainly put, that squabble, which history alone will ultimately decide, is a meaningless distraction from the actual legal issue that Respondents blindly fail ever to address—namely, why Defendants were not constitutionally entitled to rely on a rational, if allegedly incorrect,

---

[7] Francis Bacon, *Of Truth*, *in* The Essays or Counsels, Civil and Moral, 12, 12 (Paul A. Boer ed., Excercere Cerebrum Publ'ns 2016) (1625).

basis for its laws. Respondents failed to investigate, research, and discuss the law concerning rational basis review and the wide latitude it gives to the government. A reasonable inquiry into the law would have amply demonstrated this.

What Respondents effectively asked of me was to create a rule that if the results from their lay research refuted the research, decisions, and guidelines from the Centers for Disease Control and Prevention and its presidentially appointed director, then state officials are obligated to ignore the CDC and follow Respondents' epidemiological musings and conclusions. This amorphous proposition was unworkable in its formulation and frivolous in its operation here. Emergencies do not suspend constitutions, but neither do they enfeeble the police power and subject it to judicial second-guessing.

### d.  Strict Scrutiny Review

Perhaps sensing that they lacked any legal or factual basis to bring their suit under the proper rational basis standard, Respondents said that I must analyze the Government Orders under the strict scrutiny standard. They advanced two arguments: (1) that government action under the Fifth Amendment Takings Clause is subject to strict scrutiny; and (2) that there is a "fundamental right to work" which invokes strict scrutiny.

First, Respondents argued that "[s]ince there is a 'severe burden' upon the constitutional property rights, the 'strict scrutiny' doctrine applies". (Doc. 36, pgID 367). Respondents then cited a Supreme Court of Ohio case, interpreting the Ohio Constitution. (*Id.*)

Respondents were far off-base. As I explain below, there is no federal claim for violations of state law. The cited authority concerned Ohio's application of its own takings clause in its state constitution. (*Id.*) (citing generally *Norwood v. Horney*, 853 N.E.2d 1115 (Ohio 2006)).

16

The Supreme Court of Ohio in *Norwood* stated: "Though the Ohio Constitution may bestow on the sovereign a magnificent power to take private property against the will of the individual who owns it, it also confers an inviolable right of property on the people. . . . We hold that when a court reviews an eminent-domain statute or regulation under the void-for-vagueness doctrine, the court shall use the heightened standard of review . . . ." *Supra,* 853 N.E.2d at 1137, 1140 (internal quotation marks omitted).

The *Norwood* court, in fact, *expressly* deviated from the more government-deferential standard under the United States Constitution. *Id.* at 1136 ("In addressing the meaning of the public-use clause in Ohio's Constitution, we are not bound to follow the United States Supreme Court's determinations of the scope of the Public Use Clause in the federal constitution, . . . and we decline to hold that the Takings Clause in Ohio's Constitution has the sweeping breadth that the Supreme Court attributed to the United States Constitution's Takings Clause in *Midkiff* . . . .") (citing *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984)).

The United States Constitution is the standard for all cases brought under 28 U.S.C. § 1983, as Respondents tried to do here. It should have been clear to Respondents that their argument was not supported by federal law, as it needed to be.

The extent of this error shows their lack of investigation and research. Attorneys are expected to be able to research and support their contentions with authority. Not only did Respondents' authority not support their theory that takings claims are subject to strict scrutiny, their own *Norwood* case, and the *Midkiff* case to which it cites, made clear the opposite: that "where the exercise of the eminent domain power is *rationally related to a conceivable public purpose*, the [United States Supreme] Court has never held a compensated taking to be proscribed by the Public Use Clause." *Midkiff, supra*, 467 U.S. 241 (1984) (emphasis added).

17

Second, Respondents' fundamental "right to work" contention fared even worse. The Complaint alleged: "The right to earn a living and provide for yourself and your family is fundamental to our nation and should not be abridged unless necessary to serve a compelling governmental interest and even there, no greater restrictions should occur than is necessary to serve said interest." (Doc. 1, ¶ 6). Respondents never provided any authority for this claim; nor could they. Federal courts have never recognized a fundamental right to work that would trigger strict scrutiny. Instead, the Supreme Court has said that while there is "some generalized due process right to choose one's field of private employment," that right "is nevertheless subject to reasonable government regulation." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999).[8] The briefest inquiry into the law would have made this readily apparent to Respondents.

Defendants explained this law in their Motions to Dismiss, but Respondents failed to address this at all in the Opposition Brief. Respondents instead shifted their argument to say that Plaintiffs' "fundamental right[] [of] freedom of association ha[s] been violated[,] and the Court should analyze [Defendants'] actions with strict scrutiny." (Doc. 36, pgID 368). Respondents only cite generally to *County of Butler v. Wolf*, 486 F. Supp. 3d 883, 906 (W.D. Pa. 2020). But *Butler* does not explain how strict scrutiny applies here (that case applied intermediate scrutiny to a freedom of assembly issue), and Respondents made no attempt whatsoever at doing so.

---

[8] One witness, who worked with Respondents on this case after Respondents filed it, testified during the evidentiary hearing regarding an alleged right to work: "[M]any courts deemed to be it's a fundamental right [sic]." (Doc. 124, at 232:22–24). This is patently incorrect. It is not what the *Conn* case says, and it is not what any court—to my knowledge, or to Respondents' citations—has said. Even *County of Butler v. Wolf*, on which Respondents lean heavily, says that "courts generally treat government action purportedly violating the right to pursue an occupation . . . under the rational basis test. 486 F. Supp. 3d 883, 921 (W.D. Pa. 2020), *opinion vacated, appeal dismissed sub nom. Cnty. of Butler v. Governor of Penn.*, 8 F.4th 226 (3d Cir. 2021); *see also* Doc. 124, at 121:16–18.

Instead, they dropped a lone district court case in my lap and expected me to do their analytical work for them. That is not what a reasonable investigation and inquiry requires.

### e. Equal Protection Claim

Respondents' Complaint alleged a claim for "Violation of Principles of Equal Protection." (Doc. 1, ¶¶ 76–78). They alleged that the Government Orders lacked standards and guidelines to determine whether a business was an "essential business" and thus allowed to remain open. (*Id.* ¶ 76). Such lack of a system, according to Respondents, made the Government Orders "arbitrary and capricious" and therefore in violation of the Equal Protection Clause. (*Id.*).

Respondents failed to provide any allegation or argument that could possibly show how Plaintiffs were treated differently than similarly situated businesses, to support even minimally their equal protection claim. They again appeared to expect Defendants and the Court to figure their claim out for them. Respondents' lack of analysis and discussion show that they did not adequately investigate the facts or the law as to their equal protection claim.

Respondents stated that Defendants did not give any reason for treating dance studios differently. (*See* Doc. 1, ¶ 5; Doc. 36, pgID 368). This is false and another example of Respondents' careless misrepresentations to the Court. Ohio Health Director Acton's March 21, 2021 Government Order explicitly gave a reason and rationale for the various business closures. (Doc. 20-1, pgID 157) ("These businesses encourage congregation in indoor spaces where the virus that causes COVID-19 can easily spread from person to person. Persons can also be exposed to the virus by touching a surface or object that has the virus on it and then touching their own mouth, nose, or eyes."). And Director Acton's March 22, 2021 Order defines and details "Essential Businesses and Operations." (Doc. 27-1, § 12).

19

Had Respondents simply read the Government Orders, they would have known that. Instead, they made facially incorrect representations to a court without a basic understanding of the government actions they opposed.

### f.   Ohio State Law Claims

Once again, Respondents turned to entirely inapposite and irrelevant Ohio state law cases interpreting the Ohio Constitution as the basis for their lawsuit. But federal jurisdiction under § 1983 is, by its own terms, expressly limited to the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States; it is unavailable for violations of state law. 42 U.S.C. § 1983; *Laney v. Farley*, 501 F.3d 577, 580 & n.2 (6th Cir. 2007) ("Claims under 42 U.S.C. § 1983 can only be brought for deprivation of rights secured by the constitution and laws of the United States. . . . Allegations of state law or state constitutional violations will not support a § 1983 claim."); *Johns v. Supreme Court of Ohio*, 753 F.2d 524, 526 (6th Cir. 1985); *see also Robertson v. Univ. of Akron Sch. Of L.*, 2022 WL 1836922, at *4 (6th Cir. June 3, 2022) ("[T]he complaint itself describes only how [defendants' actions] violated state law . . . . Section 1983 does not provide a remedy for violations of state law.").

Further, Ohio law clearly established that there is no private cause of action for violations of the Ohio Constitution. *Provens v. Stark Cty. Bd. Of Mental Retardation & Developmental Disabilities*, 594 N.E.2d 959, 965–66 (Ohio 1992); *PDU, Inc. v. City of Cleveland*, 2003-Ohio-3671, ¶ 27 (8th Dist. Ct. App.) ("[B]ecause Sections 2, 11, and 16 of Article I [due process] of the Ohio Constitution are not self-executing provisions, they do not create independent causes of action."); *Mango v. City of Columbus*, 2020 WL 5247939, at *7 (S.D. Ohio Sept. 3, 2020). An attorney conducting even a cursory inquiry into the law would have known this.

Respondents alleged that "[t]he General Assembly of the State of Ohio was intentionally, maliciously ignored and deceived by a rouge governor and his appointees and staff." (Doc. 1, ¶ 67). Respondents leveled this charge against Defendants based on their alleged violations of various Ohio state statutes. (*Id.* ¶¶ 61–67). But "*[c]ase law is legion* that the Eleventh Amendment to the United States Constitution directly prohibits federal courts from ordering state officials to conform their conduct to state law." *Johns, supra*, 753 F.2d at 526 (emphasis added); *accord Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment."). Respondents brought state law claims that conflicted with these mandatory precedents. An inquiry into the law would have made this indisputably clear to Respondents.

The testimony and evidence that Respondents offered at the Sanctions Hearing do not address these inadequacies. The witnesses described at length various COVID-related litigations challenging state actions that they insisted showed a basis for the instant lawsuit. This is *non sequitur*. These other cases were state law claims alleging that the government exceeded its state-law authority in implementing certain pandemic response measures. As noted, federal courts, absent a federal constitutional issue, do not instruct states on how to interpret and apply their own law.

Relatedly, the Supreme Court has held that a federal vaccine mandate exceeded the executive's authority under the Occupational Safety and Health Act. *Nat'l Fed'n of Indep. Bus.*

21

*v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022). Instead of a state case challenging state authority, this was a federal case challenging federal executive authority under federal law. This line of cases is equally irrelevant here.

The witnesses discussed several cases during the hearing, without explaining whether they succeeded or how they applied to this litigation. Just because these cases had something to do with COVID restrictions never in any way made them relevant to the claims Respondents attempted to raise here. To the extent Respondents relied on these cases, they were deeply mistaken on the law.

### g. Ignoring Sixth Circuit Case Law

Respondents argue they should not be sanctioned because "[t]here was no clear binding precedent on the issues" they litigated. (Doc. 129, pgID 2000 (citing *Laborers Loc. 938 Joint Health Welfare Tr. Fund v. B.R. Starnes Co. of Fla.*, 827 F.2d 1454, 1458 (11th Cir. 1987))). This is simply not so.

About *eight months* before Respondents filed their Complaint, the Sixth Circuit held that functionally identical business closure orders in Michigan "passes muster under the rational basis test." *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (granting stay pending appeal). Even the type of business at issue in the *Whitmer* case was almost the same as the dance studios here. The plaintiffs there were indoor fitness facilities. The dance studios are also indoor fitness facilities. And as with the dance studios here, the state government ordered the suspension of fitness facility operations for the same reasons as Plaintiffs: they were deemed "non-essential" businesses, and they kept people in close proximity while indoors. *Id.*

The Sixth Circuit applied the rational basis standard to those orders, noting that the government does not need to be correct on the science and in fact can base its actions on "rational speculation unsupported by evidence or empirical data." *Id.* at 128. The Circuit said this was especially the case in "a public health crisis like the one presented by COVID-19, where "[a state's] latitude must be especially broad." *Id.*

The Sixth Circuit's application of the law to indoor fitness facilities was strikingly pertinent to the case here. The Circuit reasoned that "[t]he idea that heavy breathing and sweating in an enclosed space containing many shared surfaces creates conditions likely to spread the virus is a paradigmatic example of 'rational speculation' that fairly supports the Governor's treatment of indoor fitness facilities." *Id.* at 129.

The *Whitmer* case was practically a mirror to the facts and legal issues in this case. Appropriately, Defendants discussed the case in their Motions to Dismiss.

Having, for whatever reason, missed *Whitmer* before filing the Complaint, Respondents compounded the insufficiency and impropriety of their advocacy by entirely disregarding the case in their Opposition Brief. The first mistake remains inexplicable. The second is totally unjustifiable. Either, standing alone, violates Rule 11. The combination of both *compels* imposition of sanctions.

Not once did Respondents mention this circuit precedent. Their complete lack of engagement with such dispositive law, even after their opponents spelled it out for them, showed a failure to adequately research and investigate their Complaint and Opposition Brief.

### h.  Eleventh Amendment Immunity and Qualified Immunity

Respondents failed to adequately address the immunities retained by Defendants. This failure showed that Respondents did not investigate or research these important and dispositive legal doctrines.

Equally troublesome, neither the Complaint nor the Opposition Brief acknowledged in any meaningful way the effect of the immunity doctrines that Defendants cited in their Motions to Dismiss. The first time Respondents appear to contemplate immunity is in their Opposition Brief, after the Motions to Dismiss discussed in detail the doctrines, the case law, and their application. (*See, e.g.*, Doc. 21, pgID 199–200).

Respondents' answer to Defendants' thorough—and correct—Eleventh Amendment Immunity argument was slapdash and conclusory. As counsel for Defendant Eric Zgodzinski succinctly observed: "[H]ere is their one-sentence response" (Doc. 112, pgID1266): "The 11th Amendment has no legitimate application to immunize Defendants from the claims of the Plaintiffs and cannot be successfully asserted and raised by any Defendant against the Plaintiffs' claims." (Doc. 36, pgID 373–74). Respondents pronounced this incorrect conclusion without any discussion or any citation to a supporting authority.

Respondents argue that they should not be sanctioned because they "believed that the legal contentions asserted were supported by existing law or by non-frivolous arguments for suspending, modifying or reversing existing law or for establishing new law. "[9] (Doc. 114, pgID 1305). But Respondents never advanced any argument, let alone a nonfrivolous one, for extending, modifying, or reversing existing law. Their simple, unadorned restatement of the Rule

---

[9] The Ohio Rules of Professional Conduct impose a similar requirement: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue in a proceeding, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law." Ohio Prof. Cond. Rule 3.1 (2020).

11 standard is not enough to demonstrate they had a basis for such an argument. *See Scott v. Sanders*, 789 F. Supp. 2d 773, 776 (E.D. Ky. 2011) ("[P]laintiff could not invoke Rule 11(b)(2) where 'he failed to make a good-faith argument, or any argument at all, for the reversal of such well-established law[.]'") (quoting *Weiss v. First Citizens Bank & Trust Co.*, 111 F.3d 1159, 1170 (4th Cir.1997)); *see also Whittington v. Ohio River Co.*, 115 F.R.D. 201, 207 (E.D. Ky. 1987) ("An attorney cannot have a reasonable belief that a claim or defense is warranted by a good faith argument for the 'extension, modification or reversal of existing law,' unless he or she knows what the existing law is.").

Respondents made no effort even to engage with the law and arguments Defendants handed them. This shows Respondents' total lack of investigation and research regarding Eleventh Amendment Immunity.

I conclude the same regarding Respondents' failure to investigate and research the application of qualified immunity. Here is the entirety of Respondents' argument regarding qualified immunity:

- "Defendants knew or should have known the well established law that prevented their unconstitutional behaviors." (Doc. 36, pgID 362).

- "Putting Ohioans out of business without any opportunity for a hearing 'is one of the rare situations where the unconstitutionality of the application of a statute to a situation is plainly obvious' such that 'a clearly established right' is violated, and even qualified immunity is to be denied." (*Id.*, pgID 372).

Unlike their bald conclusion regarding Eleventh Amendment immunity, Respondents cited one case in opposition to qualified immunity: *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 488 (6th Cir. 2014). But Respondents made no attempt to explain whether this lawsuit was "one of the rare situations where the unconstitutionality of the application of a statute to a situation is plainly obvious." *Id. United Pet Supply* held that "no reasonable officer could believe that revoking [a business] permit without providing any

opportunity for a hearing was constitutional." *Id.* at 489. Procedural due process was never at issue here. Just because qualified immunity did not apply in some other case at some other time tells me nothing about whether it applies here.

What this lone citation demonstrates is the opposite: there was no "clearly established right" in this case. Respondents' own witnesses appear to agree. They testified that the pandemic was "unprecedented," a "novel circumstance," and placed the nation in "unchartered waters in our lifetime." (Doc. 124, 30:22; 31:13–32:8; 163:23–24).

As I explained in my order granting the Motions to Dismiss, numerous courts had concluded that similar pandemic closure orders did not violate the constitution. *Bojicic, supra*, 569 F. Supp. 3d at 685 n.10. Chief among them, for this case's purpose, was the Sixth Circuit's reasoning in *Whitmer, supra*, 814 F. App'x at 129. As I discuss above, this case was squarely on point on the facts and the law, and the Sixth Circuit concluded that a similar business closure order against similar businesses had a rational basis. Thus, if *anything* was "clearly established," it was that state governments in this circuit have the police power to address public health crises, including compelling the temporary closure of some businesses.

Respondents ignored this broad chorus of authority showing there was no constitutional violation. Their failure violated Rule 11.

One witness, who worked with Respondents on this case, testified that they could not make any determinations about whether immunity applied here "because we never got any discovery." (Doc. 124, at 126:7–11; *see also id.* at 229:9–24). The witness misconstrues the purpose of immunity, which "protects [government officials] from the cost and burdens of suit, *including discovery*." *Crawford v. Tilley*, 15 F.4th 752, 760 (6th Cir. 2021) (emphasis added); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("Qualified immunity balances two

important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."). Thus, "a plaintiff bears the burden of overcoming qualified immunity . . . before the commencement of discovery." *Crawford, supra*, 15 F. 4th at 760.

Respondents argue that they should not be sanctioned because immunity is not available against claims seeking injunctive relief. (Doc. 129, pgID 2003). But the Complaint never sought injunctive or declaratory relief. The only requests for a "declaration" in the Complaint asked me (1) to "declare" that Defendants violated Plaintiffs' "right to work," (2) to "declare" that Defendants violated "principles of equal protection under the law," and (3) to "declare" that Defendants orders effected an "unconstitutional taking of the Plaintiffs' property without just compensation." (Doc. 1, pgID 23).

Placing the word "declare" at the beginning of a sentence is not an incantation that converts a *de facto* damages claim to one for declaratory relief. All of the above requests to "declare" constitutional violations are necessary elements to any claim for damages under 42 U.S.C. § 1983. Thus, these requests merely asked me to find the precursors to liability for what Plaintiffs actually sought: money damages. *See EEE Mins., LLC v. State of N. Dakota*, 81 F.4th 809, 816 (8th Cir. 2023) ("[Plaintiff] simply repackages her claim for monetary relief as a request for an injunction that cures past injuries and requires the payment of just compensation. This reformulated request for retrospective relief is likewise barred by the Eleventh Amendment."); *see also* Doc. 125, at 470 ("[Mr. Renz:] We were just trying to get these guys a settlement for the money that was wrongfully—that they lost due to the violations of their constitutional rights.").

Regardless, in large part, Plaintiffs were able to reopen their businesses, albeit with restrictions on social distancing and masks. The gravamen of Plaintiffs' claims was the shutdown. Whatever was left for me to enjoin was minor. Respondents' references to the alleged inapplicability of immunity to claims for injunctive relief have nothing to do with the claims they raised and the relief they sought.

### i.  Testimony regarding Respondents' Inquiry into the Facts and Law

Prior to the evidentiary hearing, I provided Respondents and their counsel with a memorandum. (Doc. 111, attached hereto at the Appendix). That memorandum explained, in part, how Respondents could meet their burden of production—*i.e.*, that they did spend time properly investigating the facts and the law. Specifically, I asked Respondents to produce any time sheets they may have or any search history from a legal research database related to their work on this case. (App'x, at 2). Respondents chose not to do so.

I reject Respondents' counsel's suggestion that I violated Respondents' due process rights because I did not give them notice that I would consider the time records. (Doc. 129, pgID 1998). I find that criticism particularly inappropriate when my appended memorandum provided ample notice and time to respond. Contrary to Respondents' contention, I put Respondents fully on notice. That memorandum expressly invited Respondents to produce time records.

I also noted in the memorandum that there should be time records in a case that would award fees to the prevailing party. (App'x, at 2 n.10). If Respondents expected to be successful on their § 1983 claims, "[s]uch documentation [would be] required for even the most basic fee petition" to recoup their fees. *See Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 724 (6th Cir. 2016). This must mean either that Respondents did not expect to be successful, or they

intended to stick their clients with fees, through their contingent fee agreements, that Respondents could have made Defendants pay.

The absence of time records, which is the *sine qua non* of a § 1983 plaintiff attorney's duty, leads inevitably to the conclusion that Respondents simply did not do any meaningful legal research.

At the evidentiary hearing, Respondents presented testimony, their own and of others, regarding their investigation of the facts and the law in their Complaint and Opposition Brief. Respondent Renz testified that he spent "thousands of hours" on this case. (Doc. 125, at 441, 465). I do not find this statement credible. "Thousands of hours" is the total amount of work an attorney would do over the course of a year. Assuming Respondent "spent every waking moment studying every aspect of this disease," there is no indication in the Complaint or Opposition Brief that he spent even a modest amount of time studying the relevant *law*. (*Id.* at 465). Respondent Renz provided no other detail outside of his self-serving statement in his own defense.

Respondent Gargasz also testified that he conducted research prior to filing the Complaint. (Doc. 125, at 321). Even assuming he did so, the Complaint and Opposition Brief did not discuss relevant legal authority that an attorney would have uncovered during a reasonable inquiry.

Instead, Respondent Gargasz pursued cases that he should have known were entirely inapplicable to the § 1983 claims he raised here. As one striking example, Respondent said he researched and relied on *Cattleman's. Inc. v. Ashland County Health Department*, No. 20-CIV-104 (Ct. Com. Pl., Ashland Cnty., Ohio, Apr. 6, 2021) (available at Doc. 115, Resp't Ex. 28 addendum 4). Discussing that case, Respondent testified:

> [A]n Ohio judge said, hey, you know, our Constitution and the United States Constitution and the rights of the citizen have to be protected. . . . [T]hat opinion

supports the dance studios propositions. And this was all done—this was all done, Your Honor, before we filed the dance studio case. I didn't invent this, these causes of action I tried to assert.

(Doc. 125, at 291). Respondent is gravely mistaken. For starters, *Cattleman's* held that the Director of the Ohio Department of Public Health exceeded her statutory authority under *state* law. *Cattleman's, supra*, No. 20-CIV-104, at 6. As discussed above, I have no authority to compel state officials to conform their conduct to state law. But more telling, the *Cattleman's* court expressly stated: "*This proceeding is not a proceeding pursuant to 42 USC § 1983. There is no authority granting Plaintiffs a cause of action for damages arising from this proceeding asserting a violation of the Ohio Constitution.*" *Id.* at 5. Aside from never mentioning this authority in the Complaint or Opposition Brief, reliance on a case that so explicitly disavowed its own relevance to a § 1983 damages claim was unreasonable.

The other witnesses likewise provided no detail regarding Respondents' inquiry and investigation. Each of them testified that Respondents worked very hard and diligently. They did not explain the reasons for their conclusion, other than saying they would hold weekly zoom meetings to discuss together "the developing science" and their various COVID challenges. (*See, e.g.,* Doc. 124, at 165:12–13). I do not find this testimony credible. If anything, the witnesses had a bias toward Respondents because they worked with Respondents on various COVID-related cases. (*See* Doc. 124, at 69:4–6 ("[W]e were all—we were a team, and we were all in the same— we were fighting for the same mission, shall we say."); *see also id.* at 171:1–3).

The witnesses could overcome these credibility issues, including bias, if they provided detailed testimony regarding relevant cases and other law that they discussed and considered. But the witnesses here have not done so.[10] The witnesses' conclusory statements—that they do not

---

[10] Instead, for example, a witness testified that she spoke to Respondents extensively about cases such as *Home Building & Loan Association v. Blaisdell*, 290 U.S. 398 (1934), and *Chastleton*

think Respondents' conduct is sanctionable and that they think Respondents are very good and hard-working lawyers—do not overcome their apparent bias.

Regardless, relying on the opinions and analysis of others is not time spent conducting an investigation and inquiry into the facts and law of a particular case. Respondents had an independent duty to conduct an inquiry and investigation. They cannot discharge this duty simply by saying that they spoke with other like-minded lawyers who, naturally, agreed with their challenges. *Powell v. Squire, Sanders & Dempsey*, 182 F.3d 918 (table) (6th Cir. 1999) ("[The attorney] had an independent duty to make sure the claims had a basis in law."); *see also* Wright & Miller, *Federal Practice & Procedure* § 1335 (4th ed.) ("Indeed, litigants should note that the indication that the signer's certification comes 'after an inquiry reasonable under the circumstances' is itself something to which the *signer* is certifying.") (emphasis added).

There is no testimony to suggest that Respondents did any meaningful legal research at any time with regard to their complaint and other pleadings in this court—especially as to the dispositive authority of *Whitmer, supra*, 814 F. App'x 125, and the irrefutable doctrines of immunity.

I am loathe to conclude that Respondents undertook no legal research. But it is clear that whatever actual research they may have conducted was at best haphazard and was not in any way whatsoever meaningful. An attorney conducting a reasonable inquiry into the facts and law would not have made the litany of mistakes, misstatements, and legal errors contained in Respondents' filings. The sum total of Respondents' testimony and the testimony from the

---

*Corp. v. Sinclair*, 264 U.S. 543 (1924). (*See* Doc. 124, at 34:12–21). But neither case affected the issues here, where Respondents wanted me "to second-guess a state declaration of a public health emergency under state statute." *McKinley v. Grisham*, 2022 WL 2048593, at *5 (D.N.M. June 7, 2022). Respondents' reliance on discussions such as these do not demonstrate a reasonable inquiry.

outside witnesses shows that whatever Respondents and their witnesses were doing during their weekly meetings was not the type of legal research and inquiry that Rule 11 requires.

Therefore, I conclude that Respondents' conduct violated Rule 11. As I explain above, the Complaint and Opposition Brief showed that Respondents failed to make a reasonable inquiry of the facts and law as required by the Civil Rules. Their lack of diligence caused Defendants, me, and my staff to expend time and resources addressing Respondents' baseless and frivolous lawsuit. *See Kassab v. Aetna Indus., Inc.*, 54 F. App'x 819, 826 (6th Cir. 2002) ("[Plaintiff's attorney's] failure to understand the basic principles of labor law may have rendered filing the complaint and all subsequent motions sanctionable. It certainly rendered [plaintiff's attorney's] motion to sustain the action against [the remaining defendant] after the dismissal of the [other] defendants sanctionable [under Rule 11]. In response to this baseless motion, [the defendant] was required to expend its legal resources to give [plaintiff's attorney] remedial lessons in labor law."). Defendants and I needed to give Respondents lessons in basic constitutional law. Lessons they should have learned during a basic inquiry while preparing the Complaint and the Opposition Brief.

### 4.  Sanctions under 28 U.S.C. § 1927

Under 28 U.S.C. § 1927,  a court may impose sanctions against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." The Sixth Circuit construes vexatiously multiplying proceedings to include conduct where "an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of non-frivolous claims." *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1232 (6th Cir. 1986).

The Sixth Circuit also has held that § 1927 sanctions are appropriate where "an attorney has engaged in some sort of conduct that, from an objective standpoint, 'falls short of the obligations owed by the member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Holmes v. City of Massillon*, 78 F.3d 1041, 1049 (6th Cir. 1996) (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987)).

I need not find bad faith on the part of the sanctioned party. *Dixon v. Clem*, 492 F.3d 665, 679 (6th Cir. 2007) (citing *Jones, supra*, 789 F.2d at 1230). "Section 1927 sanctions may be imposed without a finding that the lawyer subjectively knew that his conduct was inappropriate." *Knopf v. Elite Moving Sys.*, 677 F. App'x 252, 257 (6th Cir. 2017) (quoting *Hogan v. Jacobson*, 823 F.3d 872, 886 (6th Cir. 2016)). "Thus, sanctions under 28 U.S.C. § 1927 require a showing of something less than subjective bad faith, but something more than negligence or incompetence.'" *Id.* (quoting *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389. 396 (6th Cir. 2009)); *see also Ruben, supra*, 825 F. 2d at 983–84 (noting that "a relaxed standard" applies to § 1927 sanctions, as a court may assess fees against an attorney "*despite the absence of any conscious impropriety*").

Respondents' Rule 11 sanctionable conduct discussed above is also sanctionable under § 1927. *See Scott v. Sanders*, 789 F. Supp. 2d 773, 776 (E.D. Ky. 2011) ("The provisions of Rule 11 are pertinent to an analysis of whether sanctions should be imposed under § 1927, because in addition to providing the procedures for seeking sanctions under the rule itself, Rule 11 enumerates the duties of counsel in filing lawsuits and making factual and legal representations to the court."). Respondents should have known that their claims lacked any legal merit.

However, falling short of their obligations under the rules, by itself, is not enough to warrant sanctions under § 1927. The attorney must also have vexatiously or unreasonably

33

multiplied the proceedings. *Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997) ("[T]he mere finding that an attorney failed to undertake a reasonable inquiry into the basis for a claim does not automatically imply that the proceedings were intentionally or unreasonably multiplied.").

Respondents vexatiously multiplied these proceedings by maintaining their lawsuit despite its utter lack of legal support. This is especially so in the face of *Whitmer, supra*, 814 F. App'x 125.

It is hard to imagine a case more directly on point than *Whitmer*. Respondents entirely disregarded this indisputably clear-cut and irrefutable authority. Had they made even a minimal effort to discover applicable authority, they necessarily would have come upon the *Whitmer* case. More to the point with regard to § 1927, they never would have filed their frivolous and fruitless Complaint.

That failure persisted even after Defendants called the case to their attention. (Doc. 21, pgID 204, 209; *see also* Doc. 26, pgID 251). The Opposition Brief continued to ignore *Whitmer*—seeming to deny its existence. A reading of *Whitmer* would have dissuaded an attorney conducting a reasonable inquiry from filing this identical claim.

Assuming arguendo that they did *some* initial legal research, their failure when confronted with Defendants' citation to *Whitmer* mandated, on the basis of that authority, immediate dismissal of their Complaint.

Even if Respondents otherwise complied with their *pre-suit* duties under Rule 11 (which they did not), their failure even to acknowledge *Whitmer*—much less try to distinguish it— manifests an egregious breach of their duty to investigate and terminate the litigation once they learned of the contrary authority. Attorneys cannot base their lawsuits on wishful thinking.

Respondents' persistence on maintaining this litigation in the face of *Whitmer* shows a deliberate, knowing, and vexatious multiplication of this litigation.

Further, Respondents' total failure to address substantively Eleventh Amendment and qualified immunity shows an intent to multiply vexatiously the litigation, bordering on bad faith. Having deliberately run through both of these redlights, Respondents had no basis whatsoever to prolong this suit. Either one of these failings justifies application of sanctions here.

Even if I could somehow conclude—though I cannot—that Respondents conducted a proper Rule 11 inquiry before filing the Complaint, the Opposition Brief shows that their complete disregard of the law in Defendants' Motions to Dismiss prolonged the litigation vexatiously. Under the circumstances, the conclusion that Respondents vexatiously multiplied the litigation is unavoidable and irrefutable.

After filing the Complaint, Respondents' maintenance of this suit in opposing and further delaying dismissal caused Defendants to incur expenses defending against these frivolous claims long after Respondents should have abandoned them.

Unwarranted delays like this are not without victims. Any person forced into litigation bears its burdens and consequences. For instance, individuals applying for a job or applying for a bank loan may be asked whether they have been or currently are engaged in litigation. An affirmative answer to that query could impair a person's ability to obtain that which they seek. Any time an attorney wrongfully and without justification causes delay, the risk arises that adverse consequences will befall an improperly ensnared litigant.

There is no evidence here that such delay caused any permanent prejudice—such as loss of a job or a bank loan due to the lawsuit's pendency. But at the very least, being called to

account for alleged misconduct is a worrisome distraction. Such distraction lasts the length of the litigation.

Respondents should have terminated this case upon reading the clear law in the Motions to Dismiss. This litigation unnecessarily continued for an additional six months, until I entered my dismissal order. During the period of delay, it is likely that some if not all Defendants were to a greater or lesser extent distracted from fulfilling their public duties and enjoying their private lives. However meaningful or meaningless such distraction and disruption may have been, the fault lay entirely with Respondents and their obdurate and unjustified persistence in maintaining this litigation. This circumstance adds, to some extent, to the vexatious consequences of Respondents' unjustifiable and indefensible misconduct under § 1927.

Not to be overlooked is the substantial impact upon judicial resources. The failure to terminate this lawsuit voluntarily when it should have ended lead to the expenditure of many hours by me and my staff. This necessarily imposes on the resources available to other litigants. That too could have been avoided if Respondents had done their duty and dismissed this case before it required my dismissal order and opinion.

Respondents never relented in pursuing claims that had no legal footing. *See Ridder, supra*, 109 F.3d at 298 ("We believe that [plaintiff's] counsel should be liable for excess costs resulting from his initial filing and persistent assertion of meritless claims, conduct that amounted to unreasonable and vexatious multiplication of the proceedings. [Plaintiff's counsel] brought suit . . . without any evidence to support a basis for municipal liability, and he persisted in pressing the allegations for over five years."). This case did not last nearly as long as *Ridder*. Nevertheless, Respondents should have known their lawsuit, like their other COVID-related suits

before this one, lacked merit. They persisted until the end—until I involuntarily dismissed their Complaint with prejudice.

### 5.  Sanctions under the Inherent Power of the Courts

I have serious doubts about the *bona fides* of Respondents' intent and purpose in creating and maintaining this litigation. But I need not examine under my inherent power what Respondents have done and left undone.

Their abject noncompliance with Rule 11 and § 1927 suffices to impose sanctions and remedies for Respondents' misconduct—namely, reimbursement of fees and costs that Defendants incurred in defeating Respondents' spurious and unfounded claims. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

### <u>Conclusion</u>

Respondents have not demonstrated even a modest effort to conduct legal research before they filed the Complaint or their futile effort to oppose the Motions to Dismiss. I am mindful that "[a]n award of attorney's fees against a losing plaintiff in a civil rights action is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Ridder, supra*, 109 F.3d at 299. But "a civil rights plaintiff [attorney] does not have free rein to bring and pursue frivolous claims." *Id.* That is what Respondents did here, and that is why I am sanctioning them.

The number and extent of their errors infected the entire case. *See* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. This was not an isolated event or an

unforeseeable mistake. It was a consistent pattern by Respondents that they exhibited in other COVID-related litigations. They did not learn from their mistakes.

As attorneys, Respondents should have known that they had to support their claims and arguments with facts and law. They failed at every turn. I conclude that their conduct was sanctionable under Rule 11 and § 1927. The record is clear that Respondents did not conduct any meaningful legal research in preparing the Complaint and Opposition Brief, and they ignored controlling authority Defendants handed them in their Motions to Dismiss.

Their reliance on discussions with other lawyers did not absolve them of this responsibility. Two wrong attorneys do not make a right one.

*If* Respondents conducted any legal research, it was wholly insufficient and inconsequential. Nothing that they have said, written, or done persuades me that they even attempted to satisfy the Rule 11 and § 1927 standards. Neither the facts they allege nor the law they cite come close to meeting their obligations. They had no business filing this suit, which was, from its outset, doomed inevitably to dismissal. Continuing this case in the face of Defendants' calling to their attention various cases and legal doctrines that barred their progress at every point was wrong-headed, and it vexatiously multiplied this litigation.

It is, therefore, ORDERED THAT:

1. Respondents violated Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.

2. Defendants' Motions for Sanctions under 28 U.S.C. § 1927 (Docs. 53 and 54) be, and the same hereby are, granted.

3. Respondents Robert J. Gargasz and Thomas B. Renz be, and the same hereby are, reprimanded for misconduct that constitutes a flagrant and willful disregard of Fed. R. Civ. P. 11 and a failure to conform their conduct to the mandates of that rule.

4.  Moving Defendants shall file a fee petition and statement of fees and costs on which they seek reimbursement under 28 U.S.C. § 1927 on or before February 28, 2024.

5.  Respondents shall file a response in opposition to the fee petition on or before March 20, 2024.

6.  Moving Defendants shall file a reply on or before April 3, 2024.

SO ORDERED.

*/s/ James G. Carr*
Sr. U.S. District Judge

# APPENDIX

| To: | Counsel of Record |
| From: | Judge James G. Carr, Senior U.S. District Judge |
| cc: | Respondents Renz and Gargasz |
| Re. | *Bojicic v. DeWine, et al.*, Case No. 3:21-cv-630 |
| Date: | March 27, 2023 |

Counsel:

This memorandum shall amend my prior memorandum that was emailed to all counsel on September 20, 2022.  In light of our subsequent discussions on the record, the below should further clarify the questions I intend to ask and the information I will seek at the evidentiary hearing currently set for May 1, 2023 at 9:00 a.m.

As before, I expect these issues, outlined below, will be pertinent to the pending Motions for Sanctions (Docs. 53, 54) and my Show Cause Order (Doc. 61).[1]

### Prior § 1983 Experience

1. Provide a list—by docket number and the parties' names—of all past or currently pending § 1983 cases in either federal or state court in which you have appeared as counsel or participated in any capacity. State your role in each case.

2. As to each § 1983 case on the list, provide a copy for each case of:
   (a) The docket sheet; and
   (b) To the extent available on a legal research database (Westlaw, Lexis, Decisis, etc.), the orders and opinions in each case.

3. Has any judge in any prior or pending case (of any type) criticized any aspect of your advocacy or performance, whether orally or in writing? If so, give details as to the case, the judge, the circumstances, and the comments.

---

[1] I granted respondents' motion for partial dismissal of defendant's sanctions motions on March 20, 2023. (Doc. 110). While Rule 11 sanctions are unavailable to defendants in light of that order, I will still consider Rule 11 sanctions (other than attorneys' fees under Rule 11(c)(4)) and the Rule 11 standard of conduct through my show cause order. (Doc. 61); *see also Dunn v. Post*, 2022 WL 1297586, at *1 (6th Cir. Jan. 27, 2022); *iParametrics, LLC v. Howe*, 522 F. App'x 737, 740 (11th Cir. 2013) ("The district court complied with all the procedural requirements of Rule 11 before sanctioning [respondent]. The district court notified [respondent] that he had violated Rule 11, and the district court held a hearing at which [respondent] could respond before imposing a sanction.").

4. Has any opposing counsel sought attorneys' fees and/or costs against you? If so, has any judge granted such request? If the answer is yes, give details.

**This Case**

5. What inquiry did you make as to each claim and defendant to confirm that:
   (a) Plaintiffs had standing to sue each defendant; and
   (b) Venue in this division was proper?

6. As to each defendant, what did you or others do to determine the factual basis for the complaint's allegations of legally cognizable and culpable conduct by that defendant individually?

7. As to each defendant, what factual basis did your investigation uncover that enabled you to certify, based on an inquiry that was reasonable under the circumstances, that the complaint's factual allegations were:
   (a) Accurate, and
   (b) As a matter of law, were supportive of your claims for relief?

8. What legal research did you—or others on your behalf—undertake to fulfill your duty to certify, based on a reasonable inquiry under the circumstances, that the claims and legal contentions in support of the complaint and your opposition to the defendants' motions were warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or establishing new law? Provide any contemporaneously generated legal research database (Westlaw, Lexis, Decisis, etc.) search histories for this research.

9. With specific reference to the doctrines of absolute and qualified immunity—as applied to each defendant—on what legal basis do you contend that your demand for monetary damages was warranted by existing law or by a well-grounded argument based on a reasonable inquiry for extending, modifying, or reversing existing law or establishing new law? Describe in detail the legal research undertaken pre-suit to formulate such legal basis.

10. Provide all contemporaneously prepared or otherwise verifiable time and billing records for yourself and others who performed legal research and undertook investigation of the factual allegations in your complaint prior to the entry of dismissal on October 27, 2021. Submit copies of your payments to any provider of computer-assisted legal research or others who assisted you.[2]

---

[2] If respondents expected to be successful on their § 1983 claims, "[s]uch documentation [would be] required for even the most basic fee petition" to recoup their fees. *See Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 724 (6th Cir. 2016).

11. On what objective basis do you contend your claims and various contentions were warranted by existing law or by non-frivolous arguments for extending, modifying, or reversing existing law or for establishing new law?

12. On what objective basis do you assert that your Complaint and your Opposition to the defendants' Rule 12 motions were not presented for an improper purpose or bad faith; intended to harass the defendants; and/or to engage in vexatious litigation?

13. The complaint contains numerous conclusory assertions and allegations. What investigation did you—or others on your behalf—undertake to confirm:
    (a) The underlying factual basis for those conclusions;
    (b) The accuracy of those conclusions; and
    (c) Their probative value?

14. On what basis, based on a reasonable inquiry, did you conclude—following receipt of the defendants' Rule 12 motions—that it was proper under Rule 11, § 1927, and this Court's inherent power for you to maintain this litigation?

15. On what basis do you contend that your purpose in pursuing litigation against the defendants was not done in bad faith; was without intent to harass the defendants; was not unreasonably and vexatiously done to multiply the proceedings; and was not intended to increase the costs of litigation?

16. In the opposition brief to the motion for sanctions, you argue that sanctions are not appropriate because the prosecution of this case complied with Ohio Rule of Professional Conduct Rule 3.1. (Doc. 59, pgID 554). On what basis do you contend that you complied with your professional obligation to "not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law"? Ohio Prof. Cond. Rule 3.1 (2020).